**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| PAUL FOWLER,<br>Plaintiff,<br>v.<br>EMORY UNIVERSITY,<br>Defendant. | CIVIL ACTION NO.<br>1:24-cv-05353-WMR |

**SUMMARY JUDGMENT ORDER**

Plaintiff Paul Fowler, a 60-year-old White man, worked for more than fifteen years in Defendant Emory University's Career Center. In August 2023, Fowler verbally extended several job offers to prospective candidates before any reference checks had been run or salary ranges had been approved. According to Emory, that was a violation of official hiring policies—so, the university fired him.

Fowler sees things differently. He says that his Black supervisor at Emory had it out for him long before the alleged policy violations. And, Emory had previously let slide similar policy violations committed by him and others. And, Emory merely demoted a poor-performing Black employee (who had not been accused of any policy violations) instead of firing him. And, finally, one Emory employee had sent an internal message to another employee (neither of whom had input on the decision to fire Fowler) complaining that Fowler's attempt to take an HR representative out

to lunch to "smooth things over" about the policy violation displayed Fowler's "80's mentality." So, argues Fowler, that all shows that Emory fired him because of his age, race, or sex. But, Fowler's evidence does not create a triable issue of any such discrimination.

Because no reasonable jury could conclude that Emory fired Fowler because of his age, sex, or race, the Court agrees with the Magistrate Judge's Final Report and Recommendation (R&R), Doc. 59, which recommends that Defendant Emory University's Motion for Summary Judgment, Doc. 50, be granted. So, the Court adopts the Magistrate Judge's R&R and supplements it with this Order.

# I. BACKGROUND

## A. Factual Background

Fowler does not separately object to the R&R's recitation of the factual background. His objections do, however, dispute certain factual conclusions drawn from the record, which the Court addresses below in considering those objections. *See* Doc. 63 at 1–2. The Court first discusses events in chronological order and then covers several matters out of order.

### 1. Chronological Background

#### a. Emory's Career Center Personnel

In 2008, Defendant Emory University hired Plaintiff Fowler as Executive Director of the school's Career Center. *See* Plaintiff's Response to Defendant's

Statement of Material Facts (SUMF), Doc. 56-1 ¶ 7.[1] At the time of Fowler's hiring, Emory maintained the Career Center under an organization known as the Campus Life organization. *See id.* ¶ 9. But, in 2022, the school created a new organization called the Pathways Center, renamed the Career Center as the Office of Career and Professional Development (CPD), and moved the CPD under the Pathways Center's umbrella. *See id.* ¶¶ 10, 12.

In June 2022, Emory's Dean, Michael Elliott (a White man over 40 years old), hired Branden Grimmett (a Black man over 40 years old) to be Vice Provost for CPD—meaning Vice Provost Grimmett (VP Grimmett) would be Fowler's supervisor. *See id.* ¶¶ 13, 16. When Dean Elliot hired VP Grimmett, he shared his criticism of the Career Center with Grimmett. *See id.* ¶ 14. According to Fowler, Dean Elliott's criticism created "a false impression of career services, which . . . perpetuated for the next two years . . . in negative ways." *Id.* Fowler doesn't contend that discrimination motivated Dean Elliott's comments. *Id.* ¶ 15.

**b. Emory's Hiring Policy**

When Emory created the Pathways Center in 2022, it transferred Amelia Bangura (Ms. Bangura) from her previous position in another Emory department to become the Senior Business Manager for the Pathways Center. *See id.* ¶ 17;

[1] Unless the Court indicates otherwise, all citations to Doc. 56-1 are facts that Plaintiff does not dispute.

Additional Material Facts (PAMF), Doc. 56-2 ¶ 28; Doc. 51-2 at 22:1–23:10. VP Grimmett notified his leadership team, including Fowler, that Ms. Bangura would be the liaison between the Pathways Center and the human resources department for hiring, onboarding, and HR needs. SUMF ¶ 18. The following week, Ms. Bangura held a meeting in which she shared the Pathways Center's official hiring policy. *Id.* ¶¶ 19, 20. The official policy instructed:

> After identifying a finalist, notify Pathways HR to initiate the reference check process with Emory recruiting. (An offer should not be extended until the results of the reference checks have been completed . . . ) When/if the reference check is completed successfully, we will engage Emory compensation to calculate the salary offer. Once the hiring manager has the salary calculation, they may verbally offer the position to the finalist and provide a tentative start date.

*Id.* ¶ 21.

### c. Emory Finds that Fowler Violated Hiring Policy

In June 2023, Fowler and Ms. Bangura began working together on posting job descriptions for several Assistant Director positions. *Id.* ¶ 22. Three candidates moved forward through the recruitment process—each of whom was a current Emory employee in another department. *See id.* ¶¶ 27, 44. After considering their applications, Fowler met with VP Grimmett to discuss the three candidates. *Id.* ¶ 23. For various reasons, Fowler had decided before the meeting with Grimmett that he needed to extend offers to the three candidates a step higher than the positions for which they had applied (Associate Director instead of Assistant Director). PAMF ¶

47. Before Fowler met with Grimmett, Fowler knew that Emory had not yet run reference checks or finalized salary analyses for the three candidates. SUMF ¶ 26. Nevertheless, he told Grimmett:

> [T]his is the slate. Everything's a go or ready to go. Do I have your permission to make the calls to make the offers of associate director to [the three candidates]? Because I'm ready to make those calls to put the offer on the table so we can get things going.

*Id.* ¶ 23. After Fowler represented that "[e]verything's a go or ready to go," Grimmett approved the plan to offer the three candidates the positions. *Id.* ¶ 24.

Later that afternoon, Fowler verbally offered the three candidates Associate Director positions. *Id.* ¶ 25. Before he did so, nobody at Emory had performed a formal reference check, nor had HR approved the final salary or job classification. *Id.* ¶ 26. Fowler also had not received any input from Ms. Bangura before extending the verbal offers. *Id.* ¶ 34.

Several days later, Fowler told Ms. Bangura for the first time that he had extended verbal offers to the three candidates, including job titles and potential salaries. *Id.* ¶ 33. Because HR had not yet approved the job classifications or salaries, Ms. Bangura told Fowler to check with HR representative Joel Tingle to see whether the three candidates needed to reapply to the different positions. *See id.* ¶¶ 35, 36. Fowler said he'd take Tingle to lunch to "smooth things over." *Id.* ¶ 37.

Flashing a month forward, Ms. Bangura apparently did not think much of Fowler's idea of how to "smooth things over" with HR. In a September 2023

message to another Emory employee, she said: "Paul [Fowler] has no clue or interest in what it takes to run a career department at a university. He's still trying to take [HR representative] Joel [Tingle] out to lunch and 'smooth things over' with his 'hiring snafu,' 80's mentality, he's just missing the oversized suit, flip phone and briefcase." *Id.* ¶ 73.[2]

Flashing back to August 2023, Fowler emailed VP Grimmett, copying Ms. Bangura, telling him that he had extended verbal offers to be Associate Directors to the three candidates with varying expected salaries. *See id.* ¶¶ 38–39. He said: "I realize we are hiring one level higher than advertised so please let me know what I need to do from an HR perspective to lock in these hires." PAMF ¶ 49.

Instead of replying to Fowler's message, Ms. Bangura called VP Grimmett to let him know that Fowler had not followed the hiring protocols before extending the verbal offers to the three candidates, and that the positions had not yet been approved. *See* SUMF ¶ 41. Grimmett told Bangura that he would schedule an in-person meeting to discuss next steps. *Id.* ¶ 43.

Before the pair could meet, Fowler emailed HR representative Tingle and Ms. Bangura, asking what needed to be done to get the three candidates situated in the

[2] Fowler also highlights a message Ms. Bangura sent to the same employee in June 2023, in which she said: "All Paul [Fowler] knows how to do is Paul aka reject change, talk about what was done historically (or lie that they are already doing it), talk crap in their team meetings…He's gonna Paul himself right out of a job." PAMF ¶ 62.

right positions. *See id.* ¶ 44. After Ms. Bangura forwarded the email to VP Grimmett, *id.* ¶ 45, Grimmett replied to HR representative Tingle, stating: "You can ignore this email. Paul is out this week and we have not had a chance to talk about the hires. Some of what he is communicating is not aligned with our recent staffing approval from the provost." *Id.* ¶ 46. The following day, Grimmett messaged Fowler and asked whether he had actually extended an offer to a particular one of the three candidates and whether he had worked with Bangura and Tingle to get clearance for the verbal offer. *Id.* ¶ 47.

Fowler responded, "Verbal offers on the table," but he indicated that he had not gotten clearance from anyone else for the verbal offer. *Id.* ¶ 48. Grimmett replied:

> No verbal offers can ever be made by you alone. Compensation must determine the pay levels for all new hires for all Emory employees. . . . I was very clear when I tapped [Ms. Bangura] to serve as the Pathways HR liaison. All hiring must go through her because she . . . is our liaison with . . . HR. . . . I'm also curious how these offers were made without formally collecting feedback from me and any others who interviewed them.

*Id.* ¶ 49. Fowler fought back: "I was checking in with you every step of the way and provided a couple of emails to you and [Ms. Bangura] regarding my actions. You . . . did give me to [sic] green light to make verbal offers when you shared the positions had been formally approved." *Id.* ¶ 50. Grimmett reminded Fowler: "Verbal offers for replacement positions still require HR approval. For dollar amounts and background checks. That's university policy, not Pathways." *Id.* ¶ 51.

Grimmett then reached out to Emory's Senior Director of HR, Laura Papotto, to request her assistance with disciplining Fowler. *Id.* ¶ 53. HR Director Papotto provided Grimmett with a draft disciplinary letter and advised him to speak with Employee Relations Director Karen Truesdale on how to address the challenges Grimmett was having with Fowler. *Id.* ¶ 54.

**d. VP Grimmett Fires Fowler**

As VP Grimmett was working with HR regarding the appropriate discipline to issue Fowler, he began considering eliminating his role entirely. *Id.* ¶ 60. Grimmett testified that his plan would have been to shut down Fowler's position and create a new Assistant Vice Provost position that would encompass some of Fowler's duties as well as an expanded set of duties. *Id.* ¶ 62.

In October 2023, VP Grimmett reached out to Employee Relations Director Truesdale to discuss Fowler's actions and the process for eliminating his role. *Id.* ¶ 63. Truesdale advised Grimmett that he needed to document and address the issues he was having with Fowler so that Emory could rightfully reject Fowler's application in case he were to apply for the new Assistant Vice Provost position. *See id.* ¶ 64. So, Grimmett asked Ms. Bangura to summarize her interactions with Fowler as a way to document Fowler's policy violations. *Id.* ¶ 65. Bangura sent Grimmett her summary that evening, which detailed various ways that Fowler had not complied with HR policies. PAMF ¶ 75. Director Truesdale also urged Grimmett to issue a

"final written warning" to Fowler before Emory eliminated his position—but, nobody ever finalized or delivered any such warning to him. SUMF ¶ 66.

A short time later, Employee Relations Director Truesdale conducted an investigation into the complaints against Fowler. *See id.* ¶¶ 67–68. She determined that Fowler's conduct violated Emory's hiring policy, so, she recommended that VP Grimmett terminate Fowler for gross misconduct instead of eliminating his position. *See id.* ¶¶ 68–69. Truesdale later explained that she considered Fowler's actions to constitute "gross misconduct" because his 15 years of management experience meant he knew or should have known Emory's hiring policies, and he violated them anyway. *Id.* ¶ 70.

VP Grimmett accepted Truesdale's recommendation and decided to terminate Fowler for violating Emory's hiring policy; the termination became effective on November 8, 2023. *Id.* ¶¶ 71, 76.

After his termination, Fowler contacted Truesdale and several other high-ranking Emory officials to complain that he had been wrongfully terminated. *Id.* ¶ 79. Truesdale then conducted a more expansive investigation to "reconcile some of th[e] discrepancies" between Fowler's complaint and what others had told her about his conduct. *See* PAMF ¶ 84. As part of her investigation, she interviewed members of Fowler's team, some of whom relayed that VP Grimmett had targeted Fowler. *See id.* ¶ 85. For example, one stated her belief that "everyone could see [Fowler's

termination] happen from a mile away." *Id.* ¶ 86. Another one said: that Grimmett "was trying to run out" Fowler; that Fowler "was pushed very hard" by Grimmett; and that Fowler "was being set up to fail." *Id.* ¶ 87. In her final report, Truesdale noted that Grimmett and Bangura could have been clearer with Fowler about what they expected when he initially reached out to request clearance to offer the jobs to the three candidates. *See id.* ¶ 88; Doc. 51-4 at 83.

**e. Fowler's Contention of Unequal Treatment**

Fowler points to a handful of other occasions where an employee was *not* terminated for violating Emory's hiring policies. First, he points out that when Emory created the Pathways Center, Ms. Bangura transferred to it without having to fill out an application, undergo a background check, provide references, undergo a salary assessment, or otherwise go through any kind of formal recruitment process. *See* PAMF ¶ 28. Second, he calls out the internal transfer hire of someone named Fiona Pierre, who transferred with Bangura to the Pathways Center. *See id.* ¶¶ 40–41. Pierre also transferred without a formal offer of employment, a salary review, or any reference check. *Id.* ¶ 42. Third, he says that VP Grimmett was hired into a role at a higher level than the one for which he had applied. *See id.* ¶¶ 38–39. And, finally, Fowler points to an offer that he himself extended that violated the hiring policy. In 2022, he offered a job to a candidate at a level higher than the one for which the

candidate had applied, and he received no formal reprimand. *See* SUMF ¶¶ 83–86; PAMF ¶¶ 30–37.

### f. Fowler's Post-Termination Email

A couple of months after his termination, Fowler discovered that he still had a laptop with his old Emory emails on it. SUMF ¶ 83. After looking through the emails, he found the email chain from 2022 when he had offered the job to the candidate at a higher level than the candidate had applied. *See id.* ¶¶ 84–86. Because he thought that email chain would help him show that he was fired pretextually, he forwarded it to Emory's Employee Relations, Human Resources, and Office of Equity and Inclusion departments. *Id.* ¶ 84. But, before he forwarded the email chain, he surreptitiously deleted two sentences that he had included in the original email: "**As you know, I have a tendency to jump the gun and issue a set salary and start date when I call to make an offer**. However, I indicated to [the candidate] that we need to review references, conduct a background check, and initiate a salary review." *Id.* ¶ 89. He later testified that he deleted those sentences because he thought they'd become a point of contention during his internal appeal. *See id.* ¶ 91.

### g. Fowler's Alleged Replacement

Emory eventually did make the Assistant Vice Provost role a reality and hired Amanda Long, a White woman, for the position. She assumed some of Fowler's previous Executive Director duties. SUMF ¶ 78.

### 2. Miscellaneous Background

#### a. VP Grimmett's Alleged Racial Bias

Fowler points to two pieces of evidence that he says illuminate the racist environment that VP Grimmett created in the CPD. First, in September 2022, the CPD hosted a Fall Career Fair event at the Emory Student Center where an altercation occurred between two of the White employees on Fowler's team and a Black Student Center employee. PAMF ¶ 15. During the incident, the Black Student Center employee allegedly shouted at the White CPD employees because she wrongly believed that they were not allowed to access the Student Center. *Id.* ¶ 16. One of the White employees contemplated calling campus security. *Id.* ¶ 17.

VP Grimmett found out about the incident and called Fowler to tell him that he had learned that a White CPD employee had "engaged in racist behavior" toward a Black Student Center employee. *Id.* ¶ 18. When Grimmett called a meeting to discuss the incident with Fowler and the two White employees, Fowler says that Grimmett "made it clear" that he believed the Black Student Center employee over the White CPD employees, and he made comments that Fowler interpreted as accusing the two CPD employees of engaging in racist conduct. *Id.* ¶¶ 19–20.

Second, according to one of Fowler's subordinate employees, Grimmett routinely asked Fowler: "Do you have POC [person of color]?" when discussing hiring for open CPD positions. *Id.* ¶ 22.

**b. Fowler's Alleged Comparator**

Fowler points to a Black man named Dominick Rolle, the Director of Undergraduate Research, as a comparator for race discrimination. PAMF ¶¶ 92–100. Rolle, as the Director of Undergraduate Research, reported directly to VP Grimmett, like Fowler did. *See id.* ¶ 92; Doc. 51-4 at 112. According to Ms. Bangura, Director Rolle struggled in his role: he was often overwhelmed and underprepared. *See* PAMF ¶ 95. In Ms. Bangura's view, he was not adjusting well to his new role (he had been hired sometime before the summer of 2023), and she felt like he was underperforming. *See id.* ¶¶ 94, 95; *see also* Doc. 51-2 at 200:14–206:24. VP Grimmett also apparently thought he was underperforming. *See* PAMF ¶ 93. Grimmett disciplined or reprimanded Rolle for his poor performance many times. *Id.* ¶ 98. But, for whatever reason, Rolle did not get fired. Instead, Grimmett demoted him and restructured his role so that he was no longer a part of the Pathways leadership team, and he no longer reported directly to Grimmett. *See id.* ¶¶ 99–100.

**B. Procedural Background**

Fowler's Complaint brings claims against Emory for race discrimination and retaliation in violation of 42 U.S.C. § 1981 and Title VII, sex discrimination in violation of Title VII, and age discrimination in violation of the Age Discrimination in Employment Act. Doc. 1. After discovery concluded, Emory moved for summary judgment on each claim asserted in the Complaint. Doc. 50. Fowler expressly

abandoned his race retaliation claims in response, but, otherwise, contended that all of his discrimination claims should move forward. *See* Doc. 56 at 1 n.1; *see also id.* at 4–27.

The Magistrate Judge recommended that the Court grant that motion for summary judgment in its entirety. Doc. 59. Fowler timely objected to the R&R. Doc. 63.

**C. The Magistrate Judge's R&R**

On the age discrimination claim, the Magistrate Judge found that Fowler had pointed to only two pieces of evidence that could conceivably contribute to his claim: the two messages Ms. Bangura sent in June and September 2023, *see supra* at 6 and note 2; Doc. 59 at 20. But, reasoned the Magistrate Judge, the claim could not proceed because there was no evidence that Ms. Bangura's comments or views about Fowler had any impact on the decision to fire him. *See id.* at 20–22. On the sex discrimination claim, the Magistrate Judge found that Fowler had not made any attempt to argue that he was fired because of his sex other than in a passing reference that he had been replaced by a woman. *See id.* at 26, 35 n.6. And, on the race discrimination claims, the Magistrate Judge found he had not produced any evidence to show that race motivated his termination. *See id.* at 26–35. For those reasons, the Magistrate Judge found that no reasonable juror could find that discrimination

caused Fowler's termination and recommended that this Court grant summary judgment in Emory's favor. *See id.* at 35.

## II. LEGAL STANDARDS

### A. R&R Standard

In reviewing the R&R, this Court "make[s] a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). After review, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to. Frivolous, conclusive, or general objections need not be considered by the district court." *United States v. Schultz*, 565 F.3d 1353, 1361 (11th Cir. 2009) (citations omitted). District courts review unobjected to portions of the report and recommendation for clear error. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a).

### B. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is proper when the record evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if evidence suggests a reasonable jury could return a verdict for the non-movant.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). The moving party bears the burden of demonstrating that there is no genuine issue of material fact that should be decided at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The Court views the evidence and any inferences that may be reasonably drawn in the light most favorable to the non-movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

## III. DISCUSSION

Fowler specifically objects to six of what he contends to be the Magistrate Judge's conclusions:

> (1) that [Fowler] failed to raise triable issues of fact and [Emory] was entitled to summary judgment on [Fowler's] discrimination claims;
> (2) that [Fowler] failed to raise triable issues of fact concerning age discrimination under a cat's paw theory;
> (3) that [Fowler] failed to present a convincing mosaic of sex and race discrimination;
> (4) that Dominick Rolle was not a valid comparator to [Fowler];
> (5) that [Fowler] failed to establish pretext with respect to his discrimination claims;
> (6) that the R&R did not discuss [Fowler's] mixed motives theory.

Doc. 63 at 2.

The Court will address each of Fowler's objections. But, for organizational purposes, the Court will address them as follows. First, the Court will discuss Fowler's age discrimination claims and related objections. Second, the Court will

discuss his sex discrimination claims and related objections. Third, the Court will discuss his race discrimination claims and related objections. And, finally, the Court will address his mixed-motive discrimination argument and related objections.

**A. Fowler's Age Discrimination Claim**

"A plaintiff can establish age discrimination through either direct or circumstantial evidence." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013). "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact in issue *without inference or presumption.*" *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (alteration adopted). But, where the evidence at issue merely "*suggests* discrimination, leaving the trier of fact to *infer* discrimination based on the evidence," that "evidence is circumstantial." *Id.* at 1081–82. An example of direct evidence of age discrimination "would be a management memorandum saying, 'Fire [Fowler]—he is too old.'" *Id.* at 1081. Fowler has not argued that there's any direct evidence of age discrimination.

That means Fowler must establish through circumstantial evidence that a reasonable jury could infer that age discrimination caused his termination. *See Sims*, 704 F.3d at 1334. "To defeat his employer's motion for summary judgment on a . . . discrimination claim, a plaintiff may use the *McDonnell Douglas* framework or the convincing mosaic approach, which [the Eleventh Circuit has] characterized as two paths to the same destination—the ordinary summary judgment standard." *Hall v.*

*Coal Bed Servs.*, No. 24-10572, 2026 WL 2581843, at *4 (11th Cir. Sept. 1, 2026) (published); *see Sims*, 704 F.3d at 1334 (discussing that, in age discrimination cases, courts may consider circumstantial evidence under either the *McDonnell Douglas* test or under the convincing mosaic approach). "Whichever path is used, the destination is the same: an answer to whether the evidence is sufficient for a reasonable jury to infer illegal discrimination." *Hall*, 2026 WL 2581843, at *4. Fowler does not use the *McDonnell Douglas* path to pursue his age discrimination claim.

Fowler, instead, tries to put together a convincing mosaic of discrimination. He says the following evidence creates a genuine issue of whether age was a but-for cause of his termination: (a) Fowler was "the only white male over 40 in Pathways Center leadership," and he "was also the only one of the Pathways Center leaders who was singled out and subjected to poor treatment by [VP] Grimmett," Doc. 63 at 3–4; (b) it was common knowledge that VP Grimmett wanted "to get rid of" Fowler long before Fowler allegedly violated hiring policies, *id.* at 4; (c) Ms. Bangura sent a message to another employee in September 2023 complaining about Fowler's "80's mentality" when it came to how he wanted to "smooth things over" with HR and commenting that "he's just missing the oversized suit, flip phone and briefcase," *id.* at 4–5; and (d) at VP Grimmett's direction, Ms. Bangura memorialized some of Fowler's missteps—a memorialization that, according to Fowler, contained some

inaccuracies, *id.* at 5. The Court need not discuss the first two pieces of "evidence" that Fowler puts forth. He has never argued that VP Grimmett was ageist or that age motivated *Grimmett's* decision to fire him. Instead, he argues that Ms. Bangura was ageist and that her discriminatory intent should be imputed to Grimmett. *See id.* at 3–8; Doc. 56 at 23–26.

Indeed, Ms. Bangura's lone comment is the only piece of evidence to which Fowler can point that even comes close to touching on his age. Fowler does not contend that Bangura's memorialization in October 2023 of Fowler's professional missteps contained anything about his age. Instead, he merely argues that her September 2023 "80s mentality" comment revealed her "ageist beliefs," that those beliefs motivated her to lie on the memorialization form, and that VP Grimmett used that memorialization form to formalize the termination. *See* Doc. 63 at 5. The Court is not convinced that Bangura's comment creates a genuine issue of material fact as to whether Emory actually fired Fowler because of his age.

It is undisputed that "Ms. Bangura did not recommend [Fowler's] termination, nor did anyone request her input on the decision." SUMF ¶ 75 (response: "Undisputed"). And, Fowler cannot show that the supposed "discriminatory animus behind [Bangura's memorialization], and not the underlying employee misconduct identified in the [memorialization], was an actual cause of [Grimmett's] decision to terminate [Fowler]." *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th

Cir. 1999). A "single stray remark . . . , which was not made by one of the ultimate decision makers . . . is too weak to raise a genuine fact issue." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010); *see also Mitchell v. USBI Co.*, 186 F.3d 1352, 1355 (11th Cir. 1999) ("[C]omments by non-decisionmakers do not raise an inference of discrimination, especially if those comments are ambiguous."); *McCreight v. AuburnBank*, 117 F.4th 1322, 1339 (11th Cir. 2024) ("[S]tray comments alone are not enough to overcome the summary judgment standard.").

In fact, as Fowler argues, VP Grimmett initially considered a reduction in force that would have eliminated Fowler's position (with the understanding that Fowler would not have been rehired in a different position). That is, before he ever asked for Ms. Bangura's memorialization, Grimmett had already decided that Fowler would not be working for Emory any longer. Based on the evidence in the record, the Court simply cannot infer that Bangura's alleged bias influenced Grimmett's decision. *See, e.g.*, *Stimpson*, 186 F.3d at 1331 ("When the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity.").

Indeed, as Fowler spends pages arguing, "[f]rom the moment [VP] Grimmett arrived at Emory, he was openly and noticeably hostile to Dr. Fowler." Doc. 56 at 6; *see id.* at 6–9. Again, Fowler has never argued that Grimmett's poor treatment of

him was because of his age. While Fowler has shown that Grimmett might not have liked him, “a dislike alone is not evidence of [age] discrimination.” *Hawkins v. Ceco Corp.*, 883 F.2d 977, 986 (11th Cir. 1989). And, while he might be able to show that Emory’s proffered reason for firing him was pretextual for some other reason (because it did not fire other employees who made similar hiring policy violations), *see infra* at 24–27, he has not shown that “discrimination was the real reason.” *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018); *see also id.* (“The plaintiff must . . . prove, by a preponderance of the evidence, that the legitimate reason proffered was a mere pretext for discrimination. A reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason.” (alterations adopted and quotation marks omitted)).

Finally, the Court agrees with the Magistrate Judge that there is no evidence that VP Grimmett acted as Ms. Bangura’s “cat’s paw.” *See* Doc. 59 at 19–22. That “theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee.” *Stimpson*, 186 F.3d at 1332. Here, Fowler concedes that “Ms. Bangura did not recommend [his] termination, nor did anyone request her input on the decision.” SUMF ¶ 75. Accordingly, there is no

way that VP Grimmett acted merely as a "rubber stamp" for a recommendation that Bangura never made. *See Stimpson*, 186 F.3d at 1332.

* * *

In sum, while Fowler might be able to show that Emory fired him for some reason other than because he violated hiring policies, *see infra* at 24–27, there is not enough evidence for a reasonable jury to conclude that Emory fired Fowler *because of his age*. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." (quotation marks omitted)).

**B. Fowler's Sex Discrimination Claim**

Fowler has all but formally abandoned his sex discrimination claim. In his response to Emory's motion for summary judgment, he makes no explicit argument in favor of that claim (which is an individual cause of action in his Complaint, *see* Doc. 1 ¶¶ 143–50). *See generally* Doc. 56. Instead, he simply lumps the sex discrimination argument together with his race discrimination argument. *See id.* at 21–27. He does the same thing in his objections to the R&R. *See* Doc. 63 at 9–14, 17–22. And, in neither brief does he explain what facts he thinks create a genuine issue of material fact for his sex discrimination claim standing alone. Because "[f]ailure to offer any argument on an issue in a brief abandons that issue," the Court

need not address Fowler's sex discrimination claim any further. *Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1341 n.8 (11th Cir. 2009). Nevertheless, the Court will address it.

A Title VII plaintiff can establish a prima facie case of discrimination by showing that he "(1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside the protected class." *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004). Under that formulation of the *McDonnell Douglas* framework, the Court presumes that Fowler has presented enough evidence to establish his prima facie case—it's undisputed that he is a man, was qualified for the job, was fired, and was replaced by a woman. *See id.*; *cf. Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc) (describing the fourth requirement differently than in *Cuddeback*: "that [the] employer treated 'similarly situated' employees outside [the plaintiff's] class more favorably").

Once the plaintiff establishes his prima facie case of discrimination, the defendant company must come forward with "evidence of a valid, nondiscriminatory reason for terminating him." *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1014 (11th Cir. 2023). If the company does produce that evidence, "the presumption of intentional discrimination drops out of the case and [the plaintiff] must demonstrate that [the defendant's] proffered reason was merely a pretext for unlawful

discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that [he] has been the victim of intentional discrimination." *Id.* (quotation marks omitted); *see also McCreight*, 117 F.4th at 1335 ("[T]he pretext prong of *McDonnell Douglas* is just the ordinary summary judgment standard."). In other words, the pretext showing requires the plaintiff to "show not only that the employer's justification was pretextual, *but that the real reason for the employment action was discrimination*." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023) (emphasis added). "Being replaced by someone outside one's protected class can help to establish the prima facie case of discrimination for burden-shifting purposes. But it is not enough to carry the day on the substantive question of discrimination." *Ossmann*, 82 F.4th at 1019 (citation omitted).

As a reminder, Emory says it fired Fowler for his hiring policy violations (offering jobs: (a) for positions at higher levels than had been posted, (b) at salaries that had not been approved, and/or (c) before reference checks had been run). Fowler says that the following evidence undercuts Emory's declared reason: (1) Ms. Bangura transferred internally without having to fill out an application, undergo a background check, provide references, undergo a salary assessment, or otherwise go through any kind of formal recruitment process; (2) Fiona Pierre, who transferred with Bangura to the Pathways Center, transferred without a formal offer of employment, a salary review, or any reference check; (3) VP Grimmett was hired

into a role at a higher level than he had applied; and (4) Fowler himself had violated the hiring policy in 2022 without being fired. *See supra* at 10–11.

It's possible that a jury could find that Fowler's evidence undercuts Emory's proffered reason—i.e., that Emory fired Fowler for some reason other than (or, in addition to) the 2023 policy violation by itself. But, the evidence does not come close to establishing that Emory treated Fowler's 2023 policy violation differently *because of* his sex. Tackling Fowler's four examples head on, the latter two are examples where men previously violated the hiring policies (VP Grimmett was hired by Dean Elliott, a man)—with the final example implicating Fowler *himself*. Evidence that Emory treated other *men* differently than how it treated him is not probative of sex discrimination. *See Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1186 n.1 (11th Cir. 1984) (noting that evidence of differential treatment of members of the same protected class as the plaintiff "is not irrelevant," and, can be considered as showing that firing was not discriminatory), *abrogated on other grounds by Lewis*, 918 F.3d 1213. And, evidence that Fowler had previously violated the hiring policies only serves to bolster Emory's nondiscriminatory reason for firing him. *See McCreight*, 117 F.4th at 1338 (finding it relevant that the aggrieved employee had previously made similar mistakes). Indeed, Fowler himself admitted in a 2022 email that he had "a tendency to jump the gun and issue a set salary and start date" when he made verbal offers. *See supra* at 11.

Likewise, the first example isn't useful because Fowler does not identify the sex of the person who allegedly violated the hiring policies by allowing Ms. Bangura to transfer. While the second example does implicate a woman allegedly violating the hiring policies, it falls flat when viewed in complete context with the other examples. Fowler argues that four people allegedly violated the hiring policies previously and got away with it—two men (including himself), one woman, and one unidentified person. While he has potentially shown that "the employer's justification was pretextual," he has not shown that "*the real reason for the employment action was discrimination*." *Tynes*, 88 F.4th at 944; *see also Lewis*, 918 F.3d at 1223 ("It is only by demonstrating that her employer has treated 'like' employees 'differently' . . . that a plaintiff can supply the missing link and provide a valid basis for inferring unlawful *discrimination*.").

At bottom, Fowler's briefs contain only one piece of evidence that is even remotely about his sex: Amanda Long, a woman, assumed some of his duties after he was fired. SUMF ¶ 78; Doc. 56 at 3; Doc. 63 at 14. Because he has put forth no other evidence that could convince a jury that Emory fired him because of his sex, there is no genuine issue of material fact. No matter the "path" used, *McDonnell Douglas* or the convincing mosaic approach, "the destination is the same": no reasonable jury could view the evidence put forth by Fowler and conclude that he was fired because of his sex. *See Hall*, 2026 WL 2581843, at *4; *see also Ossmann*,

82 F.4th at 1019 ("Being replaced by someone outside one's protected class . . . is not enough to carry the day on the substantive question of discrimination.").

**C. Fowler's Race Discrimination Claims**

Fowler also claims that race motivated his termination. He has brought claims under both Title VII and 42 U.S.C. § 1981. "A plaintiff asserting an action under § 1981 must prove that discrimination was a but-for cause of the loss of his employment contract." *Hall*, 2026 WL 2581843, at *6. "That's the same standard" as the "single-motive Title VII discrimination claim." *Id.* Under either statute, then, "a plaintiff may use the *McDonnell Douglas* framework or the convincing mosaic approach" "[t]o defeat his employer's motion for summary judgment." *Id.* at *4. "Whichever path is used, the destination is the same: an answer to whether the evidence is sufficient for a reasonable jury to infer illegal discrimination." *Id.*

He contends that the following pieces of evidence make up a convincing mosaic of racial discrimination: (a) that Emory treated Dominick Rolle differently from him because of their respective races, Doc. 63 at 15–17; (b) that VP Grimmett sided with a Black employee once when the Black employee accused Fowler's White employees of being racist, *id.* at 12–13; (c) that Grimmett routinely asked Fowler whether he had a person of color lined up for open positions, *id.* at 13–14; (d) that Grimmett generally treated Fowler poorly and singled him out, *see id.* at 9–

12, 14; and (e) that Emory's stated reason for firing him was pretextual because it had previously let others get away with similar policy violations, *id.* at 17–20.

Those facts, however, do not demonstrate that a reasonable jury could conclude that Emory fired Fowler because he is white. For starters, Fowler does not explain how the fourth fact—that Grimmett treated him poorly—had anything to do with his race other than his speculation that it did. *See Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) ("All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable.").

Fowler's pretext argument—his fifth part of the convincing mosaic above—fails for the same reasons it failed in his sex discrimination claim. *See supra* at 24–27. He complains that Emory previously had let slide similar policy violations made by other people (and himself). Again, he points to the same four previous violations: (a) Ms. Bangura's transfer made by some unidentified person; (b) Ms. Pierre's transfer made by Ms. Bangura; (c) VP Grimmett's hire made by Dean Elliott; and (d) a transfer made by Fowler himself. Of those four violations, White men made two of them (Dean Elliott and Fowler). And, the record does not include the races of the other two violators. Therefore, on this record, the fact that Emory had let slide similar violations in the past does not prove that it had discriminatory intentions when it fired Fowler. *See supra* at 24–27.

That leaves the following three facts as being the only ones that could potentially be used to construct a convincing mosaic of discrimination: (1) that Emory treated Rolle differently from Fowler because of their respective races; (2) that VP Grimmett sided with a Black employee once when the Black employee accused Fowler's White employees of being racist; and (3) that Grimmett routinely asked Fowler whether he had a person of color lined up for open positions. But, they similarly fall short of supporting an inference of discrimination.

When a plaintiff relies on comparator evidence—even under the convincing-mosaic approach—the plaintiff and his comparator should be "similarly situated in all material respects." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1312 (11th Cir. 2023) (quotation marks omitted). Some examples of material similarities include engaging in the same misconduct, being subject to the same policies, having the same supervisor, and sharing similar employment or disciplinary history. *Lewis*, 918 F.3d at 1227–28.

Emory's treatment of Rolle differs in material ways from its treatment of Fowler. It's true that Rolle, as the Director of Undergraduate Research, reported directly to VP Grimmett, as Fowler did. But, that's about as far as their similarities go. Rolle struggled in his role: he was often overwhelmed and underprepared. He was underperforming. There's no argument that Fowler struggled in the same way. Further, Rolle was new to his role; he had been hired sometime shortly before the

summer of 2023. Fowler had been in his role (or one materially like it) for many years. There's also no argument that Rolle violated any Emory hiring policies. Fowler, on the other hand, admitted in a 2022 email that he had a propensity for doing so.

On this record, all of those differences matter. Rolle held a different position than Fowler, had a different employment and disciplinary history than Fowler, and—most persuasive, here—did not engage in the same misconduct as Fowler. Therefore, Emory's differential treatment of Rolle does not move the needle in this summary judgment analysis. *See Berry*, 84 F.4th at 1312; *McCreight*, 117 F.4th at 1338–39 (finding comparators to be materially dissimilar where the plaintiff's alleged misconduct was more "severe or costly" than her alleged comparators' alleged misconduct).

That leaves only two pieces of evidence, neither of which moves the needle, either: (1) that VP Grimmett sided with a Black employee once when the Black employee accused Fowler's subordinate White employees of being racist; and (2) that Grimmett routinely asked Fowler whether he had a person of color lined up for open positions. Fowler does not adequately explain how either of those stray comments or situations demonstrates that Emory fired him because of his race. Stray comments unrelated to the termination decision are insufficient on their own to overcome the summary judgment standard. *See McCreight*, 117 F.4th at 1338–39

(affirming summary judgment even though the employer had made comments that "support[ed] [the plaintiff's] claims of discrimination," because "stray comments alone are not enough to overcome the summary judgment standard"); *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228–29 (11th Cir. 2002) (affirming summary judgment for the employer even though the employer had said, referring to plaintiff, "we'll burn his black ass," because the comment was "unrelated to a termination decision" and the plaintiff did not have any other convincing circumstantial evidence of discrimination); *see also id.* ("Although a comment unrelated to a termination decision may *contribute* to a circumstantial case for [discrimination], it will usually not be sufficient absent some additional evidence." (citation omitted)).

In sum, Fowler has not constructed a convincing mosaic of discrimination because of his race. Because he has not "provided enough evidence to suggest that [he was] fired because of [his race], [his race] discrimination claims fail." *See McCreight*, 117 F.4th at 1339.

**D. Fowler's Mixed-Motive Discrimination Claims**

Fowler is correct that the R&R does not mention his mixed-motive theory of recovery. *See* Doc. 63 at 20. But, for the reasons explained below, he has failed to show a genuine issue of material fact on that theory, either.

Fowler also argues that each of his discrimination claims could get past summary judgment under the mixed-motive, or motivating factor, test. He's wrong. As for the age discrimination claim, a mixed-motive theory cannot apply to it because it requires him to prove that age was the "but-for" cause of Emory's adverse employment action. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–76 (2009). As for the sex and race discrimination claims, "[a]n employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, was a motivating factor for an adverse employment action, even though other factors also motivated the action." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (quotation marks omitted). But, "[s]ingle-motive and mixed-motive are not . . . distinct claim types." *McCreight*, 117 F.4th at 1331. "Instead, they offer alternative theories of causation for proving discrimination." *Id.* "And underlying both theories is the same summary judgment standard: whether a plaintiff has provided sufficient evidence for a reasonable jury to infer intentional discrimination." *Id.*

For all the reasons already discussed, Fowler has not presented enough evidence for a reasonable jury to conclude that Emory discriminated against him because of his sex or race. Whether evaluated under the single-motive or mixed-motive standard, his evidence falls flat. "Missing from [Fowler's] evidence is any

indication that [any protected characteristic] played a role in [*his*] termination." *Id.* at 1333.

## IV. CONCLUSION

### A. Summary

As a reminder, Fowler made six objections to the R&R. He objected to the findings:

> (1) that [Fowler] failed to raise triable issues of fact and [Emory] was entitled to summary judgment on [Fowler's] discrimination claims;
> (2) that [Fowler] failed to raise triable issues of fact concerning age discrimination under a cat's paw theory;
> (3) that [Fowler] failed to present a convincing mosaic of sex and race discrimination;
> (4) that Dominick Rolle was not a valid comparator to [Fowler];
> (5) that [Fowler] failed to establish pretext with respect to his discrimination claims;
> (6) that the R&R did not discuss [Fowler's] mixed motives theory.

Doc. 63 at 2. Because Fowler's objections did not neatly map onto the above analysis, the Court now identifies the relevant portions of this Order that discuss the matters discussed in his objections and specifically rules on his objections. The first objection is **OVERRULED**. *See supra* at 17–32. The second objection is **OVERRULED**. *See supra* at 17–22. The third objection is **OVERRULED**. *See supra* at 22–31. The fourth objection is **OVERRULED**. *See supra* at 29–30. The fifth objection is **OVERRULED**. *See supra* at 21, 24–28. The sixth objection is **OVERRULED**. *See supra* at 31–33.

**B. Disposition**

After considering the R&R, Doc. 59, the Court **ADOPTS** the R&R as supplemented in this Order. Fowler's objections, Doc. 63, are **OVERRULED**. Emory's Motion for Summary Judgment, Doc. 50, is **GRANTED**. The Clerk of Court is **DIRECTED TO TERMINATE** this case.

**IT IS SO ORDERED** this 18th day of September, 2026.

William M. Ray II

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE